195 F.3d 905 (7th Cir. 1999)
 Ronald E. Pleva, Plaintiff-Appellant,
v.
John O. Norquist, individually and as Mayor of Milwaukee, William Christofferson, individually and as Chief of Staff to the Mayor of Milwaukee, Board of Zoning Appeals of the City of Milwaukee, et al., Defendants-Appellees.
 No. 99-1378
 United States Court of Appeals, Seventh Circuit
 Argued September 17, 1999
Decided October 26, 1999
 
 Appeal from the United States District Court for the Eastern District of Wisconsin. No. 98-C-0202--Myron L. Gordon, Judge.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Before Bauer, Flaum and Ripple, Circuit Judges.
 Flaum, Circuit Judge.
 
 
 1
 Ronald E. Pleva appeals the district court's dismissal of his claims brought under 42 U.S.C. sec. 1983; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. sec. 621 et seq.; and state tort law in connection with the termination of his tenure on the Milwaukee Board of Zoning Appeals (the "Board" or "BOZA"). For the reasons stated herein, we affirm.
 
 I. BACKGROUND
 
 2
 Because this matter comes to us from a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), we take the facts presented by Pleva in his complaint as true for purposes of this opinion. Zinermon v. Burch, 494 U.S. 113, 118 (1990).
 
 
 3
 The Milwaukee Board of Zoning Appeals consists of five members who are appointed by the mayor and approved by the Common Council (the "Council"). The mayor designates one member to be Chairperson, and the Board may select a member to serve as Administrative Officer. BOZA members serve for three-year terms and may be reappointed at the discretion of the mayor. BOZA members who are not reappointed continue to serve on the Board in a "hold-over" capacity until their replacements are confirmed by the Council.
 
 
 4
 Ronald Pleva served on Milwaukee's BOZA for 22 years, from 1975 to 1997. He was appointed Chairperson in 1975 and designated Administrative Officer in 1988. Mayor Norquist was elected in 1988 and in 1990 expressed his intention not to reappoint Pleva to the Board. The Common Council indicated that it would not approve a replacement for Pleva, so that he would continue to serve on the Board indefinitely, in spite of the mayor's refusal to reappoint him. The mayor then reappointed Pleva.
 
 
 5
 Sometime during the next seven years, Pleva was called to a meeting with the mayor and community members involved in the real estate business. At this meeting it is alleged that the mayor solicited campaign contributions and stated that he would sometimes make decisions for the Board. Also during this time, it is further alleged that Pleva was contacted by members of the mayor's staff who instructed him to vote according to the mayor's wishes on some matters. Pleva refused to submit to the political influence of the mayor.
 
 
 6
 In a May 28, 1997 letter, Mayor Norquist informed Pleva that he was being replaced as BOZA Chairperson and would not be reappointed to the Board when his term expired in June. The mayor stated that he was taking this action because he disagreed with Pleva's policies regarding zoning decisions. The letter also stated that Pleva discouraged development in the city, did not deliver decisions in a reasonable amount of time and failed to treat applicants with efficiency, fairness and courtesy. Furthermore, the letter claimed that Pleva improperly conducted Board meetings "behind closed doors."[1] This letter was quoted in the May 29 Milwaukee Journal Sentinel. During the following month, several members of the mayor's staff also made remarks that were reported in the local media regarding Pleva's service on the Board. They accused Pleva of being a "crony" of the Common Council president, who they alleged improperly influenced Pleva's vote on BOZA. Members of the city government were also quoted as claiming that Pleva recommended boxing up old open files and putting them in the basement and that he authorized the alteration of documents after they had been notarized. Pleva alleges that all of these statements were false and damaged his reputation.
 
 
 7
 Pleva's term expired at the beginning of June. Although the mayor did not reappoint him, he continued to serve on the Board as a "hold-over" member. At the June 19, 1997 BOZA meeting, the Board appointed a new Administrative Officer to replace Pleva. The subject of appointing a new Administrative Officer was not on the agenda for the meeting, and Pleva had no notice that this issue would be a topic for discussion and vote. During this meeting, which was televised on a local station, a Board member made references to the allegations of wrongdoing by Pleva and indicated that an investigation was either ongoing or should be started. In addition, a member of the mayor's staff told Pleva "you don't want to spend the rest of your days doing this." The Board began to refuse to hold meetings while Pleva was serving on it as a "hold-over." In spite of its earlier threat, the Council approved Pleva's successor on October, 14, 1997, and Pleva's tenure on the Board came to an end.
 
 
 8
 Pleva filed a claim in federal district court for the Eastern District of Wisconsin under 42 U.S.C. sec. 1983, alleging that Mayor Norquist's politically motivated decisions to reassign the position of Chairperson and not to reappoint Pleva to BOZA violated his First and Fourteenth Amendment rights. Pleva also filed a claim under the ADEA, 29 U.S.C. sec. 621 et seq., alleging that the failure to reappoint him was due to his age. Finally, Pleva filed state law claims for breach of contract, tortious interference with contract, defamation, conspiracy to injure reputation, and civil conspiracy.
 
 
 9
 The district court dismissed Pleva's federal claims and state contract claims under F.R.C.P. 12(b)(6) for failure to state a claim. The court found that Pleva's positions on the Board were policymaking positions and that the mayor's decision not to reappoint him for political reasons did not violate either his First or Fourteenth Amendment rights. The district court further found that as a policymaker Pleva was not covered under the protections of the ADEA. The district court also dismissed Pleva's contract and tortious interference claims because the court found that no contract existed between the city and Pleva. Finally, the district court declined to exercise supplemental jurisdiction over the remaining state law claims for defamation and conspiracy and dismissed those claims without prejudice. Pleva now appeals.
 
 II. DISCUSSION
 A. Standard of Review
 
 10
 The district court dismissed Pleva's claims on a 12(b)(6) motion for failure to state a claim. We review dismissals under 12(b)(6) de novo. City Nat'l Bank of Fla. v. Checkers, Simon & Rosner, 32 F.3d 277, 281 (7th Cir. 1994). A complaint is properly dismissed under 12(b)(6) if looking only at the pleadings, taking all the facts alleged by the plaintiff to be true, and construing all inferences in favor of the plaintiff, the plaintiff fails to state a claim upon which relief can be granted. McMath v. City of Gary, Ind., 976 F.2d 1026, 1031 (7th Cir. 1992); Mosley v. Klincar, 947 F.2d 1338, 1339 (7th Cir. 1991).
 
 B. 42 U.S.C. sec. 1983
 
 11
 A person states a claim under 42 U.S.C. sec. 1983 if he alleges that the defendant deprived him of a constitutional right while acting "under color" of state law. Pleva alleges that Mayor Norquist was acting under color of state law when he made the decision not to reappoint Pleva to the Board for political reasons and that this action violated his First and Fourteenth Amendment rights. Appellees do not contest that Mayor Norquist was acting under color of law when he did not reappoint Pleva. Rather, they contend that Pleva's constitutional rights were not violated.
 
 1. First Amendment
 
 12
 Generally, the First Amendment protects a person from being removed from public employment for purely political reasons.[2] Elrod v. Burns, 427 U.S. 347, 356, 363 (1976). However, there are certain types of public employment where political belief or affiliation may be an appropriate job requirement, and the First Amendment does not bar dismissal on political grounds. Branti v. Finkel, 445 U.S. 507, 517 (1980). These exemptions from the patronage dismissal ban are allowed on the theory that "a newly elected administration has a legitimate interest in implementing the broad policies it was elected to implement without interference from disloyal employees." Matlock v. Barnes, 932 F.2d 658, 662 (7th Cir. 1991); see also Grossart v. Dinaso, 758 F.2d 1221, 1226 (7th Cir. 1985) ("Elected officials must be able to rely on the political loyalty and compatibility of a policymaking civil servant in order to seize the reigns [sic] of government and realize their electoral mandate."). While exempted positions are typically classified as "policymaking" or "confidential," Elrod, 427 U.S. at 367-68; see also Elrod, 427 U.S. at 375 (Stewart, J., concurring), mere labels are not sufficient to determine which employees may have their livelihood depend on political patronage. Branti, 445 U.S. at 518. The First Amendment tolerates political dismissals only where the practice furthers "some vital government end by a means that is least restrictive of freedom of belief and association . . . ." Elrod, 427 U.S. at 363. In order to determine whether a position is exempted, we must go beyond labels to consider the "nature of the responsibilities" of the position in question. Id. at 367.[3]
 
 
 13
 The question of whether a position is exempted from the First Amendment patronage dismissal ban is a factual one that should ordinarily be left for a jury to determine. Matlock, 932 F.2d at 663, 665 (finding determination of plaintiff's policymaking and confidential status properly left to jury); Soderbeck v. Burnett County, Wis., 752 F.2d 285, 288-89 (7th Cir. 1985) (finding that when the question of whether a position involves policymaking is "sufficiently uncertain" it is properly left to the jury). However, in some cases, the duties and responsibilities of a particular position are clearly outlined by law. In these cases, the court may make the determination, as a matter of law, that a certain position involves policymaking. See Warzon v. Drew, 60 F.3d 1234, 1240 (7th Cir. 1995) (finding trial court's determination of plaintiff's policymaking status appropriate on a 12(b)(6) motion where the plaintiff could not have proven facts consistent with the allegations in her complaint that would have shown she was not a policymaker); Heck v. City of Freeport, 985 F.2d 305, 310 (7th Cir. 1993) (approving district court's determination on summary judgment that General Inspector's position was exempt from patronage dismissal ban as a matter of law). Because Pleva's position as a member of BOZA was clearly defined by state statute and city ordinance, we find that the district court's determination as a matter of law of the policymaking status of Pleva's position was proper, and we review that determination accordingly.
 
 
 14
 Political affiliation is an appropriate criterion for public employment when the effective operation of government would be compromised by requiring a public official to retain a potential political enemy in a position of responsibility. Warzon, 60 F.3d at 1239. We have articulated this test as "whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." Nekolny v. Painter, 653 F.2d 1164, 1170 (7th Cir. 1981). To make this determination, we consider factors such as whether the employee's responsibilities "are not well defined or are of broad scope" and whether the employee "acts as an adviser or formulates plans for the implementation of broad goals." Elrod, 427 U.S. at 368. It is the government's burden to demonstrate that its need is sufficient to exempt a position from the patronage dismissal ban. Id.
 
 
 15
 Wisconsin statute authorizes the creation of city boards of zoning appeals and outlines their general powers. Wis. Stat. sec. 62.23(7)(e)(7). Among those powers is the exclusive ability to grant exceptions to city zoning regulations so long as "the spirit of the ordinance shall be observed, public safety and welfare secured, and substantial justice done." Id. Cf. Skelly Oil Co. v. Common Council, 58 Wis.2d 695, 703 (1973) ("We think that Sec. 62.23(7)(e), Stats. vests exclusive authority in the board of zoning appeals to pass upon conditional uses or special exceptions."). The specific duties of Milwaukee's BOZA are provided in the Milwaukee Code of Ordinances ("M.C.O.") sec. 295-59. Among these duties is the authority to grant or deny variances and special uses. M.C.O. sec. 295-59-1. When making decisions concerning variances, Board members must make determinations concerning, for example: whether the variance "is necessary for the preservation and enjoyment of . . . property rights," M.C.O. sec. 295-59-5a-3; and whether the variance will "be contrary to the spirit, purpose and intent of [the zoning regulations], or the public interest," M.C.O. sec. 295-59-5a-4. When deciding whether to allow a special use, the Board must make determinations such as: whether "[t]he use is necessary for the public convenience," M.C.O. sec. 295-59-5b-1; and whether "public health, safety and welfare is protected," M.C.O. sec. 295-59-5b-2.
 
 
 16
 While Pleva contends that his responsibilities as a member of the Board were tightly constrained by statute and ordinance, it is clear from the sections cited above that this is not the case. Rather, Board members are given considerable discretion to implement the broad goals of city zoning policy. Concepts such as "substantial justice," "public interest," "public convenience" and "public health, safety and welfare" are inherently subject to principled disagreement. One can only assume that individual members will flesh out the meaning of these terms with their own policy, and inevitably political, interpretations of what is in the best interest of the public. Even if Pleva himself felt constrained by the regulations governing his office, we look only to "the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office," to make our determination. Tomczak v. City of Chicago, 765 F.2d 633, 640 (7th Cir. 1985). Pleva's position on the Board entails the type of broad discretionary policymaking powers that Elrod and Branti have exempted from the First Amendment's ban on patronage dismissals.
 
 
 17
 Pleva also contends that Board members are not policymakers because their decisions do not make policy but affect only the individual applicants who appear before the Board. Furthermore, Board decisions do not have precedential value and do not alter city zoning regulations. In Branti, the Supreme Court found that assistant public defenders were not "policymakers," in part because their discretionary decisions affected only their individual clients, not the public at large. 445 U.S. at 519. However, zoning regulations, and the exceptions that BOZA authorizes, inherently affect the general public, not simply the individual applicant. The decision of whether to grant a variance that allows a factory to be built in a residential neighborhood affects more than simply the factory owner. It affects all the residents of the neighborhood, the future factory workers, the city road planners who may have to construct or improve the roads leading to the factory and the citizens who live in the neighborhoods along those roads. It is because its decisions have such broad ranging impact that the Board is specifically instructed to consider the interests of the public when making them. We find that Pleva, as a member of BOZA, was a "policymaker" who was exempt from the First Amendment's ban on patronage dismissals. Therefore, Mayor Norquist could properly refuse to reappoint him for purely political reasons, and the district court's dismissal of this claim was correct.
 
 2. Procedural Due Process
 
 18
 a. Property Interest in BOZA Positions
 
 
 19
 The Fourteenth Amendment prohibits state governments from depriving an individual of a property interest without due process of law. Mathews v. Eldridge, 424 U.S. 319, 332 (1976). An individual may have a property interest in continued employment. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39 (1985) (finding a property right in continued employment for "classified civil service employees" in Ohio). However, not every employment situation creates an expectation of continued employment that rises to the level of a property interest protected by the Due Process Clause. See Heck, 985 F.2d at 311 (finding no property interest in continued employment for city General Inspector). We have recognized that in the employment context a property interest can be created either "by an independent source such as a state law securing certain benefits" or "by a clearly implied promise of continued employment." Shlay v. Montgomery, 802 F.2d 918, 921 (7th Cir. 1986) (citation omitted); see also Heck, 985 F.2d at 310.
 
 
 20
 Pleva contends that he had a property interest in his positions as Chairperson, Administrative Officer and member of Milwaukee's BOZA. To test the truth of this assertion, we must look to either an "independent source," such as the state law and city ordinance creating the Board, or a valid promise of continued employment.
 
 
 21
 Wisconsin statute sec. 62.23(7)(e)(2) provides:
 
 
 22
 The board of appeals shall consist of 5 members appointed by the mayor subject to confirmation of the common council for terms of 3 years . . . . The members of the board . . . shall be removable by the mayor for cause upon written charges and after public hearing. The mayor shall designate one of the members as chairperson . . . .
 
 
 23
 Milwaukee County Ordinance 295-59 provides:
 
 
 24
 2. MEMBERSHIP. The board shall consist of 5 members appointed by the mayor, subject to confirmation by the common council, for terms of 3 years. Board members shall be residents of the city and hold no other public office or employment except that of notary public. At least one member shall be licensed to practice law in the state of Wisconsin. The mayor shall designate one of the members as chairperson. . . .
 
 
 25
 3. . . . The board may designate one of its members who shall be licensed to practice law in the state of Wisconsin, as its administrative officer . . . .
 
 
 26
 Neither the Wisconsin statute nor the Milwaukee ordinance creates a continued expectation of employment in membership on the Board or in the positions of Chairperson or Administrative Officer. While the "lack of a contractual or tenure 'right' to re-employment . . . is immaterial to [a] free speech claim," Perry v. Sindermann, 408 U.S. 593, 597-98 (1972), this right is vital to the determination of whether a property interest exists under the Due Process Clause. See Heck, 985 F.2d at 310. In order to make out his due process claim, Pleva must show that he had a valid continued right to reappointment to his positions on the Board. He must have "more than an abstract need or desire for it. He must have more than a unilateral expectation of it." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). In Roth, the Supreme Court found that where a one- year teaching appointment contained no provision for reappointment the following year, there was "absolutely no possible claim of entitlement to re-employment." Roth, 408 U.S. at 578. Similarly, the statute and ordinance creating the Board do not contain provisions for reappointment of its members after the expiration of their three-year terms. Thus, Pleva had no valid expectation of continued employment secured by statute.
 
 
 27
 In addition, while the statute and ordinance provide that members may be removed only for cause, they make no such provision for the Chairperson or Administrative Officer. Persons in these positions serve at the pleasure of the mayor and the Board, respectively. The discretionary nature of these positions does not give rise to a property interest protected by the Due Process Clause. See Loudermill, 470 U.S. at 543 n.8. ("This is not to say that where state conduct is entirely discretionary the Due Process Clause is brought into play."). Furthermore, "[p]roperty interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. . . .'" Loudermill, 470 U.S. at 538 (quoting Roth, 408 U.S. at 577); see also Paul v. Davis, 424 U.S. 693, 709 (1976). As we noted in Listenbee v. City of Milwaukee, 976 F.2d 348, 351 (7th Cir. 1992), Wisconsin courts have determined that a Wisconsin state law property interest attaches only where dismissal from employment is "for cause," not where employment is "at will." Here, Pleva held the positions of Chairperson and Administrative Officer "at will." Therefore, he had no property interest in those positions that is protected by the Due Process Clause.
 
 
 28
 Pleva also did not have a legitimate expectation of continued employment based on an implied promise. The Common Council may have indicated that it would not confirm his successor should the mayor not reappoint him. However, the Common Council did not have the authority to create a binding continuous employment contract with Pleva. See Section II.D.1 infra. We held in Shlay that where a government body has no authority to create a career employment contract with one of its officers, any purported contract of this kind is null and void and cannot be used to create a property interest in the continued employment. Shlay, 802 F.2d at 921-22. We further found in Shlay that where a career employment agreement would "contravene the express language" of the municipal code, it is invalid and cannot create a property interest. Id. In this case, allowing Pleva to remain on the Board indefinitely would contravene Wisconsin statutory provisions and Milwaukee ordinances providing for a fixed term of 3 years for all Board members.
 
 
 29
 Because Pleva did not have a property interest in any of the positions he held on BOZA, the Due Process Clause is not implicated. The district court was correct to dismiss his claims on this count.
 
 
 30
 b. Liberty Interest in Reputation
 
 
 31
 Pleva also claims that his procedural due process rights were violated when government officials made defamatory statements about him in the course of removing him from his positions on BOZA without giving him notice and an adequate opportunity to respond.
 
 
 32
 An individual's reputation alone is not a "liberty" or "property" interest protected by the Due Process Clause. Paul, 424 U.S. at 712. However, defamation that occurs during the termination of public employment may qualify for due process protection. Id. at 710; see also Roth, 408 U.S. at 573; McMath, 976 F.2d at 1031. The Fourteenth Amendment concept of "liberty" includes "the liberty to follow a trade, profession or other calling." Lawson v. Sheriff of Tippecanoe County, Ind., 725 F.2d 1136, 1138 (7th Cir. 1984). When the government removes someone from a position "for stated reasons likely to make him all but unemployable in the future, by marking him as one who lost his job because of dishonesty or other job-related moral turpitude," the consequences are akin to depriving him of the ability to follow his chosen trade, and due process must be provided. Id. at 1139. If, in connection with the loss of Pleva's positions on the Board, government officials made "any charge against him that might seriously damage his standing and associations in his community. . . for example, that he had been guilty of dishonesty, or immorality," a due process claim may arise. Roth, 408 U.S. at 573.
 
 
 33
 Pleva contends that the statements made by city officials concerning his mishandling of files, "cronyism" with the Common Council president, alteration of notarized documents and an on-going or potential investigation of his activities on the Board constituted defamation in the course of terminating his employment that rises to the level of a due process violation. However, we do not find that Pleva has made out a due process claim because the alleged defamatory statements do not rise to the level of accusations of criminality, dishonesty or job-related moral turpitude required by Paul.
 
 
 34
 The allegations related to boxing up files and improperly conducting meetings are merely "charge[s] of mismanagement [that are] not enough to give rise to a liberty interest requiring a hearing." Hadley v. County of DuPage, 715 F.2d 1238, 1245 (7th Cir. 1983). The accusation of "cronyism" with the Common Council president would seem to reflect poorly on the Council president rather than Pleva. But in any case, given our finding that Pleva held a policymaking position, it is expected that he would form political alliances. This is precisely the reason that Mayor Norquist is free to appoint someone more loyal in his stead. As far as we are aware, merely practicing politics is neither dishonest, criminal, nor immoral. It is also highly unlikely that any statements regarding investigation of Pleva for violations of the Open Meetings Law would damage his reputation, given that a complaint was filed against him under this law and dismissed as having no merit. While a state court may find that Pleva has a valid state law claim for defamation, "not every remark which may arguably affect one's reputation violates due process if made by a government official." Lipp v. Board of Educ. of City of Chicago, 470 F.2d 802, 805 (7th Cir. 1972); see also Adams v. Walker, 492 F.2d 1003, 1008 (7th Cir. 1974) (holding an "unelaborated charge of 'incompetence, neglect of duty and malfeasance of office'" insufficient to make out a due process claim); Jeffries v. Turkey Run Consol. Sch. Dist., 492 F.2d 1, 2-3 (7th Cir. 1974) (finding charge of "highly unethical conduct" not sufficiently stigmatizing). But see McMath, 976 F.2d at 1032 (accusations of participating in or condoning criminal activity sufficient to implicate due process liberty interests). The alleged defamatory statements do not create the severe damage to Pleva's reputation necessary to make out a claim under the Due Process Clause. Thus, the district court was correct in dismissing Pleva's liberty-based due process claim.
 
 3. Substantive Due Process
 
 35
 Pleva also claims that his First Amendment and substantive due process rights were violated when the mayor interfered with Pleva's voting on the Board and removed him, at least in part, because of the votes he cast. The district court dismissed Pleva's claims on this count, and we agree with that court's reasoning. Pleva v. Norquist, 36 F. Supp.2d 839, 846-47 (E.D. Wis. 1999).
 
 
 36
 Pleva's only citation in support of his argument is to the First Circuit case Stella v. Kelley, 63 F.3d 71 (1st Cir. 1995), which in turn relies on Miller v. Town of Hull, 878 F.2d 523 (1st Cir. 1989). In these cases, the First Circuit found that "it is beyond serious question that votes cast by the members of municipal boards are ordinarily entitled to First Amendment protection." Stella, 63 F.3d at 76; see also Miller, 878 F.2d at 532. The court reasoned that the First Amendment rights of board members were infringed when they were removed from their positions for political reasons during the course of their terms in violation of state statutes that permitted removal only "for cause." Stella, 63 F.3d at 76-77; Miller, 878 F.2d at 532-33. Had Pleva's reappointment to the Board been similarly constrained by state statute, First Amendment considerations might come into play. However, the First Circuit limited its reasoning to cases where "political expression is not a legal or otherwise appropriate basis for defendants to have suspended or dismissed the public officials in question." Miller, 878 F.2d at 532 n.13. As we have discussed extensively above, political disagreement was an appropriate basis for Mayor Norquist to decline to reappoint Pleva to the Board. In this context, voting on the Board was simply one type of political activity the mayor was entitled to consider when deciding whom to appoint to this policymaking role in his administration. The reasoning in Stella and Miller does not apply, and the district court's dismissal of Pleva's substantive due process claim was correct.
 
 4. Equal Protection
 
 37
 Pleva next contends that his rights under the Equal Protection Clause were violated because the mayor declined to reappoint him out of personal animosity. He relies on our holding in Esmail v. Macrane, 53 F.3d 176, 179 (7th Cir. 1995), to support his claim. In Esmail, we held that an individual may state a claim under the Equal Protection Clause if he can show that state government took an action against him that "was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." Esmail, 53 F.3d at 180. In that case, the plaintiff alleged that he was denied a liquor license based on minor infractions of the licensing requirements, while others who committed worse violations were routinely granted licenses. Esmail claimed that this denial was due to personal animosity by state officials against him. Id. at 178. Pleva alleges that denying him reappointment to the Board is analogous to denying Esmail renewal of his liquor license.
 
 
 38
 As with his due process claim, Pleva misses the important factual distinctions in this case. The liquor licenses in Esmail were supposed to be distributed on an impartial basis, using rules and standards. To use the impartial public licensing process to mount a partisan personal attack would have been acting with an illegitimate state objective. However, where policymaking positions are concerned, it is wholly legitimate for a government official to use his discretionary appointment power to reward his friends and keep his political, or personal, opponents at a distance. As we noted in Farr v. Gruber, "[p]ersonal enemies are political ones too . . . . A personal falling out will not long endure without political consequences." 950 F.2d 399, 402 (7th Cir. 1991). The ability to get along with the mayor was a legitimate qualification for membership on the Board, and one that Pleva apparently lacked. The mayor acted legitimately in declining to reappoint him, and the district court acted correctly in dismissing his claim.
 
 C. Age Discrimination
 
 39
 Pleva next contends that he was removed from his designation as Chairperson because of his age, and then he was removed as Administrative Officer and not reappointed to BOZA in retaliation for filing an age discrimination claim against the City of Milwaukee. Pleva claims that these actions violated the ADEA, 29 U.S.C. sec. 621 et seq.
 
 
 40
 Section 630(f) of the ADEA provides: "The term 'employee' means an individual employed by any employer except that the term 'employee' shall not include . . . an appointee on the policymaking level . . . ." As we held above, Pleva was a policymaker. Therefore, he was not covered under the ADEA, and his claim has no merit. It was properly dismissed by the district court.
 
 D. State Law Claims
 
 41
 In addition to his federal claims, Pleva brought pendent state law contract, defamation and conspiracy claims. After dismissing all of Pleva's federal claims, the district court used its discretion under 28 U.S.C. sec. 1367(c)(3) to exercise jurisdiction over the contract claims, dismissing them with prejudice, and to decline to exercise jurisdiction over the defamation and conspiracy claims, dismissing them without prejudice. We review the district court's decision to dismiss the contract claims with prejudice de novo. Warzon, 60 F.3d at 1237. We review its decision to dismiss the defamation and conspiracy claims without prejudice for abuse of discretion. See Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 728 (7th Cir. 1998) ("[T]his Court has characterized the district court's discretion to relinquish pendent jurisdiction as 'almost unreviewable,' especially when all federal claims have been dropped from the case before trial and only state law claims remain.") (quoting Huffman v. Hains, 865 F.2d 920, 923 (7th Cir. 1989)).
 
 1. Contract Claims
 
 42
 Pleva alleges that the Common Council's promise in 1990 that it would not confirm his successor if the mayor refused to reappoint him, so that he would continue to serve on the Board indefinitely as a hold-over member, created an "implied-in- fact" employment contract between Pleva and the city. Pleva contends that Mayor Norquist and the Council breached this contract when the mayor failed to reappoint him and the Council confirmed his successor. Pleva further contends that Mayor Norquist engaged in tortious interference with contract when he induced the Board to refuse to hold meetings while Pleva was sitting in a hold- over capacity. This action forced the Common Council to confirm Pleva's successor in violation of his contract.
 
 
 43
 The district court was correct in concluding that Pleva has alleged no facts that would support the conclusion that an employment contract was created in this case. Even if there was an understanding between Pleva and the Common Council that he would continue to serve on the Board indefinitely, Pleva has shown us no statute or ordinance granting the Council the authority to enter into this type of contract. Furthermore, such a contract would directly contravene the state statute and city ordinance that make appointments to the Board valid for only three years. Because the Council had no authority to enter into an employment contract with Pleva and because any such contract would contravene state statute and municipal ordinance, any employment contract between Pleva and the Council, if there was one, is void. See Shlay, 802 F.2d at 921 (finding employment contract could not be created where corporation counsel had no authority to create a career position for person in plaintiff's position), 922 (finding purported employment contract that would violate municipal code "null and void"); cf. Heck, 985 F.2d at 311 ("[O]fficials lack authority to vary the terms of municipal and state ordinances."). Because there was no valid contract, the district court properly dismissed Pleva's contract claims with prejudice.
 
 2. Defamation and Conspiracy
 
 44
 The district court found that Pleva's defamation and conspiracy claims are "not obviously totally lacking in merit" and may raise novel questions of state law. That court's conclusion that these claims may have merit, but that the state court is a better forum for their adjudication, is not unreasonable. Thus, the district court's decision to dismiss the remaining claims without prejudice is not an abuse of discretion and is affirmed.
 
 III. CONCLUSION
 
 45
 For the foregoing reasons, the judgment of the district court dismissing all of Pleva's federal claims and state law contract claims with prejudice and dismissing his defamation and conspiracy claims without prejudice is Affirmed.
 
 
 
 Notes:
 
 
 [1]
 An Open Meeting complaint was filed against Pleva in connection with these allegations. The Milwaukee County corporation counsel found the charges to have no merit, and a subsequent court case filed by the city was dismissed.
 
 
 [2]
 Pleva was not "removed" from his position on the Board of Zoning Appeals. Rather, Mayor Norquist elected not to reappoint Pleva after the natural expiration of his term. We are not concluding that these two actions are equivalent. Because we resolve the First Amendment claim on other grounds, we need not reach this issue at this time. We will, therefore, treat Pleva's non- reappointment as the equivalent of a "removal" for the purpose of the First Amendment discussion.
 
 
 [3]
 However, because many of the positions that qualify for the exemption from the First Amendment ban on patronage dismissals can be characterized as "policymaking," we will use this term as a shorthand reference for positions that meet the exemption test. See Matlock, 932 F.2d at 662 (7th Cir. 1991) ("[T]hough a functional approach is now preferred to a definitional one, the descriptions '"policymaking" and "confidential" accurately describe the vast majority of offices that fall within the realm of legitimate patronage.'") (quoting Meeks v. Grimes, 779 F.2d 417, 420 (7th Cir. 1985)).